E-FILED
Tuesday, 09 April, 2019  01:52:44 PM
Clerk, U.S. District Court, ILCD

# IN THE UNITED STATES DISTRICT COURT
## FOR THE CENTRAL DISTRICT OF ILLINOIS
### SPRINGFIELD DIVISION

| | | |
|---|---|---|
| NICHOLAS CAMPBELL and | ) | |
| JODEEN CAMPBELL, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Case No.:  19-cv-3090 |
| v. | ) | |
| | ) | |
| BLESSING HEALTH SYSTEM, | ) | |
| d/b/a BLESSING HOSPITAL | ) | |
| | ) | |
| Defendant. | ) | |

## AMENDED COMPLAINT

Plaintiffs Nicholas Campbell and Jodeen Campbell, by their attorneys, Jennifer Sender and Andrés J. Gallegos of Robbins Salomon & Patt, Ltd., for their Amended Complaint against Defendant Blessing Health System, d/b/a Blessing Hospital and Quincy Surgical Center ("Blessing Health," or the "Defendant"), an Illinois not-for-profit corporation, state as follows:

## JURISDICTION AND VENUE

1.     This court has subject matter jurisdiction pursuant to 28 U.S.C. § 1331 as the Plaintiffs' claims alleged herein arise under the Americans with Disabilities Act (the "ADA"), 42 U.S.C. § 12101, *et seq*., Section 504 of the Rehabilitation Act of 1973 (the "Rehabilitation Act"), 29 U.S.C. § 794, *et seq*.; and Section 1557 of the Patient Protection and Affordable Care Act ("Section 1557"), 42 U.S.C. § 18116. Injunctive relief is authorized by Rule 65 of the Federal Rules of Civil Procedure.

2.     Venue is proper in this district pursuant to 28 U.S.C. § 1391(b). All the events or omissions giving rise to Plaintiffs' claims occurred in this district.

**THE PARTIES**

3.      Plaintiff Nicholas Campbell ("Nicholas"), is a 32-year old male, and is profoundly deaf. He has been deaf since he was an infant. Nicholas' primary means of communication is through American Sign Language ("ASL"), and he has limited ability to read and write the English language and limited ability to lip-read. He has no familiarity with medical terminology. He is a person with a disability within the meaning of all applicable statutes. Nicholas resides with wife, Jodeen, and their children, in Quincy, Illinois.

4.      Plaintiff Jodeen Campbell ("Jodeen"), is a 28-year-old female, and is hearing. Jodeen is fluent in ASL but she is not licensed or certified to interpret in a medical setting. She has no familiarity with medical terminology. Jodeen is married to Nicholas. Jodeen resides with Nicholas, and their children, in Quincy, Illinois.

5.      Blessing Health is an Illinois not-for-profit corporation, which is based in Quincy, Illinois and serves west central Illinois, northeast Missouri, and southeast Iowa.  Blessing Health operates two hospitals, various specialty clinics, and a physicians' group.  Blessing Health operates Blessing Hospital, a 307-bed acute-care hospital, which is the only hospital in Quincy, Illinois. Blessing Health also operates the Surgical Center of Quincy, which provides out-patient surgical procedures.

**FACTUAL BACKGROUND**

6.      The deaf community struggles with significant health disparities and is often excluded from health surveillances, outreach programs and mass media healthcare messages. Deaf users of ASL, through cultural and language barriers, are at high risk for poor health knowledge

2

and inequitable access to medical care in our health system. These barriers directly translate to inadequate assessment, limited access to treatment, insufficient follow-up and poorer outcomes. For example, as compared with the hearing population, for the deaf population there are lower rates of individuals accessing preventative services, worse cardiovascular health outcomes and higher rates of diabetes and obesity.[1] ASL is the primary language for many people who are deaf; however, interpreters are often not provided during medical visits, when such medical visits are for them and for their minor children, as is the case here.

7.      Blessing Health has a history of failing to provide Nicholas with auxiliary aids and services to allow him to effectively communicate with Blessing Health's medical and nursing staff. Further, Blessing Health improperly relied on Jodeen to facilitate communication between physicians and nurses and Nicholas during numerous vital encounters in connection with medical services that Jodeen and one of the Campbell's children received at Blessing Health's hospital and the Surgical Center of Quincy, and for medical services provided to him. Accordingly, Blessing Health failed to allow Nicholas to participate in his wife's and child's care, and his own health care.

8.      On September 16, 2016, Nicholas took Jodeen, who was nine weeks pregnant, to Blessing Health's hospital emergency department for severe vaginal bleeding. Jodeen had called the hospital's emergency department before arrival asking that they have the video remote interpreting ("VRI") equipment available in the emergency room as they were coming. Upon arrival, the VRI equipment was not available for the triage and Jodeen had to conduct all the interpretation for Nicholas. Emergency room staff ultimately provided VRI equipment in the

---

[1] *See* Schoenborn, M.P.H., et al., Health Disparities Among Adults with Hearing Loss: United States, 2000 – 2006, Center for Disease Control and Prevention, Health E-Stats. Available at:
http://www.cdc.gov/nchs/data/hestat/hearing00-06/hearing00-06.htm

examination room, but there was only intermittent connection for short periods as the equipment kept disconnecting. When the VRI was functioning, the interpreter had to stop frequently to ask for clarification and the interpreter had difficulty hearing the doctors and nurses, which led the interpreter to misinterpret statements, like whether the baby had a heartbeat and was still alive. During the over five hours the Campbells were at the hospital fearing that Jodeen had a miscarriage, Jodeen was forced to interpret for Nicholas, despite her limited ASL skills, that she was receiving treatment, and her own anxiety and stress over her condition. Fortunately, Jodeen did not have a miscarriage.

9.       This experience was further frustrating for Nicholas and Jodeen, because they had the same experience with the lack of auxiliary aids and services at Blessing Health's hospital one year earlier. In 2015, Jodeen delivered her first child at Blessing Health's hospital. Blessing Health did not provide an on-site interpreter during that hospitalization. Further, although Blessing Health did provide VRI equipment, the equipment did not work. Even though Blessing Health was aware of the problem with VRI, nothing was done in the interim year to ensure that it could provide deaf patients with on-site interpreters or functioning VRI.

10.      Following these incidents and in anticipation of her hospitalization at Blessing Health's hospital for the delivery of her second child, Jodeen advised the staff that they needed to provide an on-site interpreter for Nicholas for the delivery. The staff agreed and requested that Jodeen also contact an interpreter for assistance. Jodeen made arrangements with an ASL interpreter to be available for the delivery and they asked her to call the interpreter directly if she went into labor before her scheduled due date.

11.     On the morning of April 14, 2017, Jodeen went into labor and was rushed to Blessing Health's hospital, and Jodeen contacted the interpreter. When Jodeen and Nicholas arrived at the hospital's labor and delivery department, the interpreter had not yet arrived and Nicholas again had to rely on Jodeen, who was in labor, to interpret. When the interpreter that Jodeen had prearranged to assist arrived, she stayed with Nicholas during Jodeen's C-section for approximately two to three hours. Jodeen stayed in the hospital until the morning of April 16, 2017. Nicholas was with Jodeen overnight on April 14. He went home the morning of the 15th but returned that evening and stayed with Jodeen until her discharge on April 16. As they were being discharged, despite Jodeen's requests for an on-site interpreter or the use of VRI, Jodeen had to interpret for Nicholas when the baby's pediatrician came into Jodeen's room to examine the baby and release her to go home, as well as when Jodeen's obstetrician came in to Jodeen's room to release her and provide her with discharge instructions.  Nicholas had an interpreter for only the two to three hours of the delivery of their daughter. The hospital did not provide any other communication assistance for Nicholas for the remaining time he was in the hospital.

12.     The Campbell's baby subsequently developed chronic ear infections for which the insertion of tubes was required. The surgery was scheduled for May 16, 2018, at Blessing Health's Surgical Center of Quincy (the "Surgery Center"). Jodeen informed the Surgery Center's administrator that Nicholas would require an ASL interpreter for the date of the surgery. The administrator requested that Jodeen interpret for Nicholas. Jodeen refused. Jodeen provided the administrator with names of licensed interpreters she knew who provided services in Quincy. When attempting to confirm that an interpreter would be available for the surgery, Jodeen was bounced back and forth between the surgery center and Blessing Health's hospital trying to find someone who would be responsible for ensuring that an interpreter would be available. In one

discussion with a surgery center nurse, that nurse informed Jodeen they were uncomfortable with having an on-site interpreter as they did not know if they would be able to trust that person's interpretation and, therefore, they preferred utilizing VRI. Jodeen explained their concerns with utilizing VRI.  On or about May 11, 2018, Jodeen received a telephone call from John McDowell, who the Campbell's believed to be Blessing Health's director of social services, asking whether Jodeen had hired an interpreter for the surgery. She stated that she did not and informed Mr. McDowell that it was Blessing Health's responsibility. She also reminded him that she previously provided names and contact information of interpreters in the area.   Jodeen explained their concerns with utilizing VRI and had to argue for Blessing Health to provide an on-site interpreter. The surgery was postponed. The Surgery Center then arranged for an on-site interpreter and rescheduled the surgery.

13.     On March 6, 2019, at approximately 9:50 A.M., Nicholas was taken to Blessing Health's hospital emergency department as Nicholas broke his hand and Jodeen met him there. Jodeen called the emergency department to let them know they were enroute, that Nicholas was deaf, and she requested they have VRI equipment available. Upon arrival, after some trouble getting the VRI equipment to operate, the VRI equipment was used effectively for triage. After Nicholas was assigned to a treatment room within the emergency department, Dr. Wissam Derian came in to evaluate Nicholas and Jodeen requested he utilize the VRI equipment. The doctor did not know that Blessing Health had this equipment and didn't know how to use it. Jodeen provided him with directions on how to use it. Once a connection was established, the VRI transmission froze within seconds and attempts were made to reconnect but it would not work at all. Minutes later, a nurse came into the treatment room to speak with them. Jodeen informed the nurse that Nicholas was deaf, and the nurse apologetically stated, "she did not know" and she tried to turn on

the VRI equipment, but it would not work. Subsequently, another nurse came in to the treatment room and took the VRI equipment out stating that she was going to try to get it fixed. A few nurses then returned with the VRI equipment and they were able to get it to work and the doctor was able to speak with Nicholas informing him that he would be admitted.

14.     Admission was necessary as Nicholas has a congenital heart condition and prior to surgery a cardiologist consult was required. Jodeen then requested that an on-site sign language interpreter be provided for Nicholas for when he needs to communicate with the orthopedic surgeon, the cardiologist, for preop, during the surgery and postop. Thereafter, Jodeen had to inform every staff member that subsequently came into the treatment room speaking to Nicholas that he was deaf, and they needed to use the VRI equipment, often instructing them how to use the equipment. Subsequently, a staff member from registration came in and started speaking with Nicholas. Jodeen informed her that Nicholas was deaf and that she needed to use the VRI equipment. The staff member responded "Oh, it's okay. You can just do it." Jodeen informed her that she could not as it was not legal and Jodeen turned on the VRI equipment, and once it turned on the staff member expressed amazement stating "That thing is really cool. I have never seen that before and didn't know we had that." Stressed from telling every person who walked into the room, and instantly started talking, that Nicholas was deaf, Jodeen asked a nurse to hang a note on the door of his room stating that he was deaf. Nicholas was subsequently admitted and assigned a patient room on the 5th floor, the observation floor. Jodeen stayed with Nicholas as she was afraid for him to be alone without any means by which to communicate.

15.     Nicholas was assigned to a two-person room and VRI equipment was brought in. As Nicholas was settling in, another patient was brought in who was constantly yelling, which created significant difficulties for the sign language interpreter to be able to hear and interpret for

Nicholas. Jodeen asked if they could be moved to a quieter room to help ensure the VRI interpreter is able to hear, and that was denied, but, later that evening that roommate was moved to a different room. However, a new patient was assigned to Nicholas' room that evening who had many visitors at a time, which created significant background conversation that also limited the effectiveness of VRI as the interpreter had poor receptive and expressive sound quality to be able to hear and interpret accurately.

16.    On March 7, 2019, a cardiologist came to consult with Nicholas. When Jodeen informed him that Nicholas was deaf and insisted the doctor utilize the VRI equipment, the doctor expressed confusion over the reason VRI was needed. A nurse tried to explain to the doctor how VRI worked – that he just needed to talk and that the interpreter on screen would interpret in sign language for Nicholas. However, the doctor talked over the nurse, and as Jodeen attempted to interrupt to inform the nurse and doctor that for the VRI to be effective when there are multiple people in the room, that only one person could speak at a time, the doctor disregarded her comments and continued to talk over her. Jodeen also attempted to explain to the doctor that he had to stay close to the VRI equipment to ensure the interpreter could hear him. The doctor ignored those instructions and repeatedly walked across the room mid-conversation and away from the VRI equipment, minimizing its effectiveness. When Jodeen had asked whether the doctor had consulted with Nick's cardiologist who specializes with adults that have congenital defects, he stated that he did not and became very agitated and told Jodeen that they could just leave and go to Peoria if they wanted. The doctor then asked Nicholas a series of questions, which the interpreter was not able to keep up with, and upon Jodeen informing him of that, the doctor became very irritated and proceeded with his questions anyway. Out of frustration, Jodeen and Nicholas stopped talking to the doctor. After the doctor left, Nick expressed his frustration to the nurse that the doctor

ignored their instructions on utilizing VRI and at the interpreter could not at times hear the doctor or keep up with the doctor and could not interpret effectively when multiple people were talking at once.

17.     On March 7, 2019, someone from the hospital's staff brought to Nicholas power of attorney paperwork to see if he wanted to fill it out. Jodeen turned on the VRI equipment for the staff member to use and asked the staff member if she could explain the paperwork or read it to Nicholas through the remote interpreter. The staff member told Jodeen that they could just read it for themselves. Jodeen had to explain to the staff member that English is not Nicholas' primary language and if she read it the interpreter will communicate what she's reading to Nicholas in his language, ASL. Only then did the staff member read the document to Nicholas.

18.     On March 7, 2019, Blessing Health secured an interpreter for Nicholas' surgery for the next. On March 8, 2019, the interpreter arrived at approximately 8:45 A.M., accompanied Nicholas in the operating room and was able to stay with Nicholas until 4 P.M. when he was out of surgery and returned to his room. Communication was effective while the interpreter was present. After the interpreter left, Nicholas could not utilize the VRI equipment as he was in considerable pain and groggy from the anesthesia. Numerous nurses came to speak with Nicholas and Jodeen and Jodeen had to interpret for Nicholas.

19.     Jodeen felt compelled to stay with Nicholas throughout the entirety of his hospital admission, and not go home to be with their children, except for brief breaks of just over one hour on March 6 and March 7. Jodeen believed she had to stay with Nicholas as no one on the staff seemed to be aware of his rights to a sign language interpreter or other assistive devices to help him communicate, and Jodeen felt that few staff members knew how to operate the VRI

equipment. Jodeen also felt she needed to be there to ease Nicholas' anxiety and frustration for not being provided a means by which to communicate effectively.

20.     At discharge, VRI equipment was utilized when Nicholas' surgeon and attending physician came to speak with him. However, when a physical therapist came to provide Nicholas with discharge instructions and to evaluate him, which required walking in the hallway and utilizing stairs, there was no interpreter and Jodeen was compelled to provide interpretation.

21.     Defendant acted intentionally and with deliberate indifference when it failed to provide the benefit of its services to Plaintiff Nicholas Campbell. Specifically, Defendant failed to provide appropriate auxiliary aids and services to him to effectively communicate during visits to Blessing Hospital and its Surgery Center in April 2017 and May 2018, and most recently during his hospitalization at Blessing Hospital in March 2019.  In each visit and during his hospitalization, Nicholas had numerous vital encounters with doctors and nurses where for the absence of either an on-site sign language interpreter, functional VRI equipment, or the utilization of VRI equipment in patient rooms with multiple roommates where multiple conversations occurred at the same time, effective communication was not achieved denying Nicholas the opportunity to participate in the care provided to his wife, children and his own health care. Without having an on-site sign language interpreter, functional and effective VRI equipment, and having Jodeen interpret for him, in each instance, resulted in humiliation, frustration, anxiety and emotional distress or Nicholas.

22.     Defendant also acted intentionally and with deliberate indifference towards Plaintiff Jodeen Campbell, by denying her, on the basis of her husband's disability, the full and equal enjoyment of facilities, equipment and health care services Defendant offers.  Specifically, Defendant failed to provide appropriate auxiliary aids and other assistance to her husband,

Nicholas, and instead relied on her, in April 2017 while she was receiving treatment, to facilitate communication between physicians, nurses, and staff and Nicholas. Defendant relied upon her again to facilitate communication between physicians, nurses, the staff and Nicholas during Nicholas' hospitalization for his wrist surgery in March 2019. In those instances where Defendant relied upon Jodeen to interpret for Nicholas there were no emergencies involving an imminent threat to the safety or welfare of Nicholas or to the public, and Nicholas did not specifically request that Jodeen interpret for him. Having to bear the burden of providing interpreting services for Nicholas, in each instance it resulted in increased stress, anxiety, frustration and emotional distress for Jodeen.

23.     As a Medicare and Medicaid provider, Blessing Health is a recipient of federal funds within the meaning of the Rehabilitation Act. For the fiscal year ending 2016, approximately 72% of Blessing Health's inpatient patients were Medicaid and Medicare recipients, and approximately 60% of all outpatient patients were Medicaid and Medicare recipients.[2]

24.     Plaintiffs intend to utilize Blessing Health's medical facilities and seek treatment from its specialists in the future.  Nicholas Campbell suffers from a congenital heart condition and one of Plaintiffs' daughters also has a heart condition which may require immediate care at Blessing Health's facilities. Plaintiffs' primary care physicians with Quincy Medical Group have admitting privileges to Blessing Hospital. Blessing Hospital is approximately 17 miles from the Plaintiff's residence and is the only hospital in Quincy. Blessing Health owns and operates the only surgery center in Quincy. All of Blessing Health's facilities and service providers are network

---

[2] Illinois Hospital Report Card and Consumer Guide to Healthcare, Illinois Department of Public Health. Available at: http://www.healthcarereportcard.illinois.gov/hospitals/view/101160 (21.51% and 52.32% of Blessing Hospital's inpatients were Medicaid and Medicare recipients, respectively; and 23.02% and 36.46% of Blessing Hospital's outpatients were Medicaid and Medicare recipients, respectively).

providers of Plaintiffs' health insurance carriers, Blue Cross Blue Shield of Illinois and HealthLink.

## COUNT I

### Nicholas Campbell - Violation of the Americans with Disabilities Act, 42 U.S.C. § 12131

1-24.   Plaintiff incorporates by reference paragraphs 1 to 24.

25.   Plaintiff's claims in Count I arise under the Americans with Disabilities Act, 42 U.S.C. §§ 12101 – 12189 (the "ADA"), and its implementing regulations under Title III, applicable to public accommodations, 28 C.F.R. §§ 36.101 – 36.608, which provide in pertinent part as follows:

A.   No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation. 42 U.S.C. § 12182(a); 28 C.F.R. § 36.201.

B.   It shall be discriminatory to subject an individual on the basis of a disability or disabilities of such individual, directly, or through contractual, licensing, or other arrangements, to a denial of the opportunity of the individual to participate in or benefit from the goods, services, facilities, privileges, advantages, or accommodations of an entity. 42 U.S.C. § 12182(b) (1)(A)(i); 28 C.F.R. § 36.202(a).

C.   It shall be discriminatory to afford an individual, on the basis of a disability or disabilities of such individual, directly, or through contractual, licensing, or other arrangements with the opportunity to participate in or benefit from a good, service, facility, privilege, advantage, or accommodation that is not equal to that afforded to other individuals. 42 U.S.C. § 12182(b)(1)(A)(ii); 28 C.F.R. § 36.202(b).

D.   It shall be discriminatory to fail to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages, or accommodations. 42 U.S.C. § 12182(b) (2)(A)(ii); 28 C.F.R. § 36.302(a).

E.     The term "public accommodation," as used in the statute, includes hospitals. 42 U.S.C. § 12182(a); 28 C.F.R. § 36.104.

26.     Pursuant to the statutory directive in 42 U.S.C. § 12186(b), the U.S. Department of Justice has promulgated regulations to implement Title III's broad nondiscrimination mandate with respect to covered entities. One of these regulations, titled "Auxiliary aids and services," specifies that "[a] public accommodation shall furnish appropriate auxiliary aids and services where necessary to ensure effective communication with individuals with disabilities." 28 C.F.R. § 36.303(c)(1). Although "the ultimate decision as to what measures to take rests with the public accommodation," the public accommodation "should consult with individuals with disabilities whenever possible to determine what type of auxiliary aid is needed to ensure effective communication." *Id.* § 36.303(c)(1)(ii). The chosen method must "result[] in effective communication." *Id.* Moreover, to "be effective, auxiliary aids and services must be provided in accessible formats, in a timely manner, and in such a way as to protect the privacy and independence of the individual with a disability." *Id.*

27.     The acts and omissions of Defendant violated and continue to violate the ADA and its implementing regulations in one or more or all the following manners, as Defendant has discriminated against Nicholas by:

A.     Denying him the opportunity for the full and equal enjoyment of Defendant's goods, services, facilities, privileges, advantages, or accommodations.

B.     Denying him the opportunity to participate in or benefit from Defendant's goods, services, facilities, privileges, advantages, or accommodations.

C.     Offering or affording him services that are not equal to those services afforded to other individuals who are not deaf.

D.     Failing to make reasonable modifications in policies, practices, or procedures, which are necessary to afford Defendant's goods, services and facilities to Nicholas where such modifications would not fundamentally alter the nature of its goods, services or facilities.

E.      Intentionally failing to provide plaintiff appropriate auxiliary aids and services to achieve effective communications and to participate in Jodeen's his daughter's and his own healthcare.

F.      Otherwise having discriminated against the plaintiff because of his disability.

28.     As a proximate result of Defendant's violations of the ADA, Defendant has inflicted injury and damages upon the Plaintiff, including loss of a civil right, mental anguish, humiliation, and mental pain and suffering.

29.     Defendant's conduct constitutes ongoing and continuing violations of the ADA. Unless restrained from doing so, Defendant will continue to violate the ADA. This conduct, unless enjoined, will continue to inflict injuries on Plaintiff, for which he has no adequate remedy at law. Therefore, pursuant to section 308 of the ADA (42 U.S.C. § 12188), Nicholas is entitled to injunctive relief.

30.     Plaintiff is entitled to reasonable attorney's fees and costs, pursuant to 42 U.S.C. § 12205.

WHEREFORE, plaintiff Nicholas Campbell prays for the following relief against Defendant:

A.      An order enjoining Defendant from discriminating against the Plaintiff, requiring Defendant to (i) adopt and implement a legally compliant communication access policy; (ii) make available to deaf patients and their companions an array of auxiliary aids and services; and (iii) provide its appropriate employees training on its communication access policy, the proper utilization of auxiliary aids and services and interacting with persons who are deaf;

B.      A declaration that Defendant is operating in a manner which discriminates against the Plaintiff and that Defendant fails to provide communication access to the Plaintiff as required by law;

C.      An award of attorneys' fees and costs; and

D.      Such other relief as the Court deems just.

## COUNT II

### Nicholas Campbell - Violation of the Rehabilitation Act of 1973, 29 U.S.C. § 704

1-24.    Plaintiff incorporates by reference the paragraphs 1-24.

25.    At all relevant times herein, Defendant received federal financial assistance in the form of reimbursement from the federal Medicare and Medicaid programs and is therefore subject to the anti-discrimination provisions of the Rehabilitation Act, as herein described.

26.    At all times relevant herein, there was in full force and effect a statute known as the Rehabilitation Act of 1973, 29 U.S.C. § 701 *et sequitur*, and its implementing regulations, 45 C.F.R. § 84.4(a). The Section 504 implementing regulation provides that "[n]o qualified handicapped person shall, on the basis of handicap be excluded from participation in, be denied the benefits of or otherwise be subjected to discrimination under any program or activity which receives or benefits from Federal financial assistance." 45 C.F.R. § 84.4(a).

    A.  The regulation further provides:

    "A recipient, in providing any aid, benefit, or service, may not, ... on the basis of handicap: (ii) Afford a qualified handicapped person an opportunity to participate in or benefit from the aid, benefit or service that is not equal to that afforded others ..."

    45 C.F.R. § 84.4(b)(1) (ii).

    B.  Elsewhere, the Section 504 regulation states:

    "In providing health, welfare or other social services or benefits, a recipient may not on the basis of handicap: … (2) Afford a qualified handicapped person an opportunity to receive benefits or services that is not equal to that offered non-handicapped persons.

    45  C.F.R. § 84.52(a)(2).

C.  In addition, "[a] recipient hospital that provides health services or benefits shall establish a procedure for effective communication with persons with impaired hearing for the purpose of providing emergency health care." 45 C.F.R.  § 84.52(c).

D.  The regulation further provides:

"A recipient to which the subject applies that employs 15 or more persons shall provide appropriate auxiliary aids to persons with impaired sensory, manual, or speaking skills, where necessary to afford such persons an equal opportunity to benefit from the service in question."

45 C.F.R. § 84.52(d)(l).

E.  The regulation provides that such "auxiliary aids may include interpreters… and other aids for persons with impaired hearing… 45 C.F.R. § 84.52(d)(3).

F.  The Section 504 regulation defines a person who has a disability as any person who:

"(i) has a physical or mental impairment which substantially limits one or more major life activities, (ii) has a record of such an impairment, or (iii) is regarded as having such an impairment."

45 C.F.R. § 84.3(j)(l)(i)-(iii).

G.  A qualified person with a disability, with respect to the provision of health, welfare and social services, is a person "who meets the essential eligibility requirements for the receipt of such services." 45 C.F.R. § 84.3(k)(4).

27.    Through the acts and omissions alleged herein, Defendant has, solely on the basis of Plaintiff's disabilities, excluded Plaintiff from participating in its services, denied Plaintiff the benefit of its services, denied Plaintiff the opportunity to participate in Jodeen's healthcare, and subjected Plaintiff to discrimination in violation of 29 U.S.C. § 794. *et seq*., and the regulations promulgated thereunder, and have resulted in injury to Plaintiff.

28.    Defendant's acts and omissions alleged herein violated the Rehabilitation Act and

its implementing regulations and discriminated against Plaintiff by:

A.   Denying him the opportunity for the full and equal enjoyment of the services, privileges, advantages, or accommodations of the facilities owned, operated and/or contracted for use by Defendant.

B.   Denying him the opportunity to participate in or benefit from the services, facilities, privileges, advantages, or accommodations of Defendant's facilities.

C.   Offering or affording him services that are not equal to those services afforded to other individuals without hearing impairments.

D.   Failing to make reasonable modifications in policies, practices, or procedures, which are necessary to afford its services to Plaintiff where such modifications would not fundamentally alter the nature of its services.

E.   Failing to establish a procedure for effective communication with Plaintiff for the purpose of providing health care.

F.   Acting intentionally and with deliberate indifference by failing to provide Plaintiff appropriate auxiliary aids and services, such as an on-site sign language interpreter or effective video remote interpreting services, where the taking of such steps would not fundamentally alter the nature of its offered services or would not result in undue burden, despite knowing the failure to do so would likely result in harm to the Plaintiff's federally protected rights and failed to act upon that likelihood.

G.   Defendant has otherwise discriminated against the Plaintiff.

29.   Section 505(a)(2) of the Rehabilitation Act, 29 U.S.C. § 794(a)(2), states that the "remedies, procedures and that the rights set forth in title VI of the Civil Rights Act of 1964 [being 42 U.S.C. § 2000(d) *et sequitur*] shall be available" for violations of section 504 of the Rehabilitation Act. By law, such remedies include compensatory monetary damages. *Barnes v. Gorman*, 536 U.S. 181 (2002).

30.   As a proximate result of Defendant's violations of Section 504, Defendant has inflicted injury and damages upon the Plaintiff, including loss of a civil right, mental anguish, humiliation, and mental pain and suffering.

31.     Plaintiff is entitled to reasonable attorneys' fees and costs, pursuant to section 505(b) of the Rehabilitation Act, 29 U.S.C. § 794(a), as Defendant's conduct has inflicted injury and damages upon Plaintiff, including loss of a civil right, mental anguish, and mental pain and suffering.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Nicholas Campbell prays for the following relief:

A.      An order enjoining Defendant from discriminating against the Plaintiff, requiring Defendant to (i) adopt and implement a legally compliant communication access policy; (ii) make available to deaf patients and their companions an array of auxiliary aids and services; and (iii) provide its appropriate employees training on its communication access policy, the proper utilization of auxiliary aids and services and interacting with persons who are deaf;

B.      A declaration that Defendant is operating in a manner which discriminates against the Plaintiff and that Defendant fails to provide communication access to the Plaintiff as required by law;

C.      An award of compensatory monetary damages;

D.      An award of attorneys' fees and costs; and

E.      Such other relief as the Court deems just.

## COUNT III

### Nicholas Campbell - Violation of Section 1557 of the Patient Protection and Affordable Care Act, 42 U.S.C. § 18116

1-24.   Plaintiff incorporates by reference paragraphs 1-24.

25.     Since March 2010, there was in full force and effect a statute known as the Patient Protection and Affordable Care Act (the "Affordable Care Act"), 42 U.S.C. § 18001, *et seq.,* Pub.L. 111-148. Section 1557 of the Affordable Care Act prohibits discrimination on the basis of race, color, national origin, sex, age, or disability in certain health programs and activities. 42 U.S.C. § 18116. Section 1557's implementing regulations, 45 C.F.R. §§ 92.1 – 92.203, effective as of July

18, 2016, apply to health programs or activities administered by recipients of Federal financial assistance from the Department of Health and Human Services.

26.      As Defendant participates in Medicare and Medicaid, it is a covered entity subject to compliance with Section 1557.

27.      The implementing regulations of Section 1557 prohibit discrimination of an individual on the basis of disability, *inter alia*, and prohibit an individual from being excluded from participation in, denied the benefits of, or otherwise be subjected to discrimination under any health program or activity. *See* 45 C.F.R. § 92.101(a)(1). Those regulations, in pertinent part, require covered entities to:

A.      Take appropriate initial and continuing steps to notify beneficiaries, enrollees, applicants and members of the public:

(1)      that the covered entity does not discriminate on the basis of race, color, national origin, sex, age, or disability in its healthcare programs or activities. 45 C.F.R. §92.8 (a)(1);

(2)      that the covered entity provides appropriate auxiliary aids and services, including qualified interpreters for individuals with disabilities and information in alternate formats, free of charge and in a timely manner, when such aids and services are necessary to ensure an equal opportunity to participate to individuals with disabilities. 45 C.F.R. §92.8 (a)(2);

(3)      how to obtain aids and services. 45 C.F.R. §92.8 (a)(4);

(4)      the identification of, and contact information for, the responsible employee designated to be responsible for adoption of grievance procedures. 45 C.F.R. §92.8 (a)(5);

(5)      the availability of grievance procedures and how to file a grievance pursuant to §92.7(b). 45 C.F.R. §92.8 (a)(6); and

(6)      how to file a discrimination complaint with the Department of Health and Human Services Office of Civil Rights. 45 C.F.R. §92.8 (a)(7).

B.      That a covered entity shall take appropriate steps to ensure that communications with individuals with disabilities are as effective as communications with others in

> health programs and activities, in accordance with the standards found at 28 C.F.R.
> §§ 35.160 through 35.164. 45 C.F.R. § 92.202(a).

28 C.F.R. §§ 35.160 through 35.164 are the communication access standards required of public entities under Title II of the ADA. Where those regulatory provisions use the term "public entity," the term "covered entity" shall apply in its place. *See* 45 C.F.R. § 92.202(a). As applied to Section 1557 covered entities, the Title II regulations require them to "take appropriate steps to ensure that communications with applicants, participants, members of the public, and companions with disabilities are as effective as communications with others." 28 C.F.R. § 35.160(a)(1). In addition, a covered entity "shall furnish appropriate auxiliary aids and services where necessary to afford qualified individuals with disabilities, … companions, … an equal opportunity to participate in, and enjoy the benefits of, a service, program or activity of a [covered] entity," 28 C.F.R. § 35.160(b)(1); and "[i]n determining what types of auxiliary aids and services are necessary, a [covered] entity shall give *primary consideration* to the requests of individuals with disabilities ….**" 28 C.F.R. § 35.160(b)(2) (emphasis added).

28.     Defendant had a duty under Section 1557 to give primary consideration to Plaintiff's communication preference and provide them with an ASL interpreter, either on-site or via effective VRI.

29.     Defendant's acts and omissions violated Section 1557 and its implementing regulations as Defendant did not take appropriate steps to ensure that communications with Plaintiff were as effective as communications with others in its healthcare services, and Defendant failed to meet its obligations under Section 1557 and the standards found at 28 C.F.R. §§ 35.160 through 35.164. 45 C.F.R. § 92.202(a).

30.     Section 1557's implementing regulations provide that the enforcement mechanisms available for and provided under Title VI of the Civil Rights Act of 1964, Section 504 of the Rehabilitation Act, *inter alia*, shall be available for purposes of Section 1557 as implemented by this part, and "compensatory damages for violations of Section 1557 are available in appropriate administrative and judicial actions brought under this rule." *See* 45 C.F.R. § 92.301.

31.     Defendant's conduct constituted violations of Section 1557.

32.     Section 505(a)(2) of the Rehabilitation Act, 29 U.S.C. § 794(a)(2), states that the "remedies, procedures and that the rights set forth in title VI of the Civil Rights Act of 1964 [being 42 U.S.C. § 2000(d) *et sequitur*] shall be available" for violations of section 504 of the Rehabilitation Act. By law, such remedies include compensatory monetary damages. *Barnes v. Gorman*, 536 U.S. 181 (2002).

33.     Plaintiff is entitled to reasonable attorneys' fees and costs, pursuant to section 505(b) of the Rehabilitation Act, 29 U.S.C. § 794a.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff Nicholas Campbell prays for the following relief:

A.     An order enjoining Defendant from discriminating against the Plaintiff, requiring Defendant to (i) adopt and implement a legally compliant communication access policy; (ii) make available to deaf patients and their companions an array of auxiliary aids and services; and (iii) provide its appropriate employees training on its communication access policy, the proper utilization of auxiliary aids and services and interacting with persons who are deaf;

B.     A declaration that Defendant is operating in a manner which discriminates against the Plaintiff and that Defendant fails to provide communication access to the Plaintiff as required by law;

C.     An award of compensatory monetary damages;

D.     An award of attorneys' fees and costs; and

E.      Such other relief as the Court deems just.

## COUNT IV

### Jodeen Campbell - Violation of the Rehabilitation Act, 29 U.S.C. § 704

1-24.    Plaintiff incorporates by reference paragraphs 1 to 24.

25.    Plaintiff's claims in Count IV arise under the Rehabilitation Act, 29 U.S.C. § 701

*et sequitur*, Public Law 93-112, 87 Stat. 355, as amended, and its implementing regulations, 45

C.F.R. § 84.4(a), which provide in pertinent part that "[A]ny person aggrieved by any act or failure

to act by any recipient of Federal assistance" under the Rehabilitation Act may bring suit. 29 U.S.C.

§ 794a(a)(2). This includes the non-disabled. In fact, "the use of such broad language in the

enforcement provisions of the Rehabilitation Act evinces a congressional intention to define

standing to bring a private action under the Rehabilitation Act  . . . as broadly as is permitted by

Article III of the Constitution." *Innovative Health Sys., Inc. v. City of White Plains,* 117 F.3d 37,

47 (internal quotation marks omitted). The standing provision of the Rehabilitation Act, §

794a(a)(2), is distinct from the provision prohibiting discriminatory conduct on the part of the

recipient of federal assistance, § 794(a). Therefore, the type of injury a "person aggrieved" suffers

need not be "exclu[sion] from the participation in, ... deni[al of] the benefits of, or ... subject[ion]

to discrimination under any program or activity receiving Federal financial assistance." 29 U.S.C.

§ 794(a)

26.    Defendant receives federal financial assistance in the form of reimbursement from

the Medicare and Medicaid programs and is therefore subject to the antidiscrimination provisions

of the Rehabilitation Act, as herein described.

27.    On April 14, 2017, despite being in labor and dealing with the stress of labor,

Jodeen had to not only communicate with Blessing Hospital's doctors and nurses directly for

herself as Nicholas could not on her behalf, she also had to interpret for Nicholas, which exacerbated her stress and anxiety.

28.     Through the remaining time that she remained in the hospital following the delivery of her daughter, Jodeen had to bear the responsibility to do what Blessing Hospital was unwilling or incapable of doing, interpret for Nicholas during numerous vital encounters they had with doctors and nurses. Nicholas had an interpreter for only the two to three hours of the delivery of their daughter. The hospital did not provide any other communication assistance for Nicholas for the remaining time he was in the hospital.

29.     Similarly, when the Campbell's baby required surgery for the insertion of tubes to combat her chronic ear infections, originally scheduled for May 16, 2018, at the Surgical Center, Jodeen again had to bear the responsibility and stress of interpreting for Nicholas.  That surgery was postponed only because Jodeen refused to agree to interpret for Nicholas and because Nicholas and Jodeen refused to pay for an interpreter if the surgery center arranged for one.

30.     Jodeen had to bear that responsibility again recently this past March during Nicholas' 3-day hospitalization for his broken wrist in the frequent instances when the VRI equipment was not operable or ineffective because of either transmission problems, doctors refusing to heed guidance on how to utilize it properly, and when Nicholas was assigned to multiple person rooms.

31.     At all relevant times herein, Defendant knew that Plaintiff had a federally protected right to not be required to act as an interpreter for her husband, and Defendant's acts and omissions alleged herein violated and continue to violate the Rehabilitation Act and its implementing regulations in one or more or all of the following manners as defendant has discriminated against Plaintiff by:

A.      Denying her the opportunity for the full and equal enjoyment of Defendant's goods, services, facilities, privileges, advantages, or accommodations.

B.      Denying her the opportunity to participate in or benefit from Defendant's goods, services, facilities, privileges, advantages, or accommodations.

C.      Offering or affording her services that are not equal to those services afforded to other patients whose companions not deaf.

D.      Failing to make reasonable modifications in policies, practices, or procedures, which are necessary to afford Defendant's goods, services and facilities to Plaintiff where such modifications would not fundamentally alter the nature of its goods, services or facilities.

E.      Acting intentionally and with deliberate indifference in requiring Plaintiff to interpret for Nicholas, when Defendant knew that Plaintiff was a family member and not a licensed interpreter.

F.      Otherwise having discriminated against Plaintiff because of her relationship with a person with a disability.

32.     As a direct and proximate result of the foregoing, Plaintiff suffered the loss of a civil right and suffered great mental anguish, and she was otherwise injured and damaged.

33.     Section 505(a)(2) of the Rehabilitation Act, 29 U.S.C. § 794(a)(2), states that the "remedies, procedures and that the rights set forth in title VI of the Civil Rights Act of 1964 [being 42 U.S.C. § 2000(d), *et sequitur*] shall be available" for violations of section 504 of the Rehabilitation Act. By law, such remedies include compensatory monetary damages. *Barnes v. Gorman*, 536 U.S. 181 (2002).

34.     Plaintiff is entitled to reasonable attorneys' fees and costs, pursuant to section 505(b) of the Rehabilitation Act, 29 U.S.C. § 794a.

WHEREFORE, Plaintiff Jodeen Campbell prays for the following relief:

A.      An order enjoining Defendant from discriminating against the Plaintiff, requiring Defendant to (i) adopt and implement a legally compliant communication access policy; (ii) make available to deaf patients and their companions an array of auxiliary aids and services; and (iii) provide its appropriate employees training on its communication access policy, the proper utilization of auxiliary aids and services and interacting with persons who are deaf;

24

B.     A declaration that Defendant is operating in a manner which discriminates against the Plaintiff and that Defendant fails to provide communication access to the Plaintiff as required by law;

C.     An award of compensatory monetary damages;

D.     An award of attorneys' fees and costs; and

E.     Such other relief as the Court deems just.

**Plaintiffs Demand Trial by Jury.**

Dated:  April 9, 2019                          Nicholas Campbell and Jodeen Campbell, Plaintiffs.

                                               /s/ Jennifer M. Sender
                                               _____
                                               One of Their Attorneys

Jennifer M. Sender (ARDC No. 6207774)
Andrés J. Gallegos (ARDC No. 6212168)
Attorneys for Plaintiffs
ROBBINS, SALOMON & PATT, LTD.
180 N. LaSalle, Suite 3300
Chicago, Illinois 60601
(312) 782-9000 - Telephone
(312) 782-6690 - Facsimile
jsender@rsplaw.com
agallegos@rsplaw.com
#3075985 (14215.1)